My name is Karen Connery and I represent Sha-ron Haines, a physical and sexual abuse survivor of the foster care system, and I would like to apologize as I have three minutes for rebuttal. Mr. Haines was deprived of his constitutional right to a fair trial in the district court below when, against the wishes of the alleged victim, the government invoked the Rape Shield Law Federal Rule of Evidence 412 to preclude him from presenting evidence that was indicative of his innocence, and where, in a zeal to convict this young man, the government engaged in rampant prosecutorial misconduct which subverted the quest for truth and justice and secured a conviction in a case where evidence of guilt was marginal. Addressing the Rape Shield issue, the government laid out its case in opening argument. Sha-ron Haines, the government alleged, was J.C.'s pimp. He recruited her, and it was his plan to take J.C. and A.S. to California for purposes of them to engage in prostitution. However, J.C. testified that was not the case. J.C., 15-and-a-half years old, my client was 18 years old, 18 years and 3 months, she testified that was not true. She testified that she's what's called in prostitution parlance a renegade, that she works for herself, that she does not use a pimp, she does not share her money with anybody, she keeps her money for herself and works for herself. But doesn't that mean that your client basically got his whole case in with her hostile testimony? One more time. Didn't your client benefit from all this testimony? Basically, she made the argument you're making, that she was independent, that this business of him being in control of her was not true. So how did it harm her, this Rape Shield ruling, given her testimony? It harmed her because after she testified to that effect, the government called her a liar. The government impeached her with her coarse grand jury testimony. Not only did the government impeach her with her testimony, but it also called in Mr. King, who was a co-defendant, who himself was a pimp. What was illegitimate about that, though? They're not – they're not – Well, it's prejudicial because it got – it was the government who chose to attack her credibility. When she testified that she was doing this on her own volition, the government essentially called her a liar, thereby undermining her credibility. But the only thing that you wish she could have also said is, and I did this before, but they still could have brought in her grand jury testimony to impeach her and called her a liar. I mean, I don't understand how having her say I was a prostitute before this was going to affect whether she was impeached. Because the government was arguing that my client recruited her, that my client was her pimp, the fact that she had for a year previously been engaging in prostitution as a renegade, as a solo practitioner, without the utilization of a pimp, without sharing her money, was – was evidence of his innocence and was also evidence which could have been used to rehabilitate her. Why does that contradict that he took her to California? Why does the fact that she might have done prostitution on her own before contradict the fact that what King testified and what she testified? Well, it was relevant to his mere presence defense. His presence was – he didn't deny that he went along. His defense was that he went along for the ride because he liked the girl. He liked her. He was invited by Mr. King. The way he actually knew Mr. King was when this young – this young man was 18 years and 3 months old when this crime occurred. At the age of 18, he aged out of the foster care system. He was placed in the home of Mr. King's pharaoh, Mr. King's father, who was a known pimp. As it was established during sentencing, as the sentencing transcript, juvenile authorities became aware that they had placed Mr. Haynes in this home where he shouldn't be, but before they could remove him, he aged out of the system. So that's how he knew this son, Mr. King. He was his friend and he was an admitted pimp and burglar. My client's case, my client's defense was, look, I like Jordan. I like JC. They were going to California. I got invited to go along. Him just being merely present does not mean – He got the mere presence instruction, but he was not able to rehabilitate his witness when she was attacked. Her credibility was attacked by the government. I just still don't understand how it would rehabilitate her, though. She contradicted – her grand jury testimony contradicted her trial testimony. So she was going to be attacked for that – she lied under oath in one situation or the other. And how saying I was a prostitute before would change that, I don't understand it. Because when the government attacked her with her grand jury testimony, which I would submit is – was coerced, and I'd like to address that a little later, but that the reason she lied in front of the grand jury was because the detective had her incarcerated. She was immediately released right after she testified. She testified that the reason I lied in front of the grand jury was because I didn't want to be in custody. By the time of trial, she was already back in custody because she had done other violations when she was out. So trial came around. She had nothing to lose. She was willing to tell the truth because she wasn't going to get out. And didn't she tell that whole story you just gave us to the jury and they didn't believe her? Well, they didn't believe – well, it was an issue of credibility. I mean, the judge mentioned that this case boiled down to an issue of credibility. Who do they believe? King or Haynes. And I think it's relevant because this was other evidence. This was evidence that went directly to his theory of defense. Look, his theories of defense was I was merely present. And to support that, this young lady has been doing this for years. She's never used a pimp. Now, I think it would be a little different scenario if the government didn't choose to attack her credibility. So they attacked her credibility. I think he, under due process, since this went to an element of his defense, the fact that – and it wasn't sexual conduct that he was seeking to submit. That was not really what was relevant. It was the fact that she never used a pimp because the government was saying, yes, you did. He is your pimp. The fact for a year previously that she had engaged in prostitution activities and never used a pimp is relevant to that, specifically when they chose to attack their own witness. She had an explanation for why she lied in front of the grand jury. But she gave that explanation. She wasn't prevented from giving that explanation. Well, after she gave that explanation, that's when they brought in King. And King said, no, no, he recruited her. He's her pimp, and I'm Nass's pimp. And so the government chose to bring in Mr. King, who's a cooperating co-defendant, to impeach her credibility, to attack her credibility. I don't understand why they don't – why they don't have a right to do that or why there was – there's something wrong with that. Well, I think they may have a right to do that, but I think he had a right to come in and say, look, you're saying that she's – she's not a renegade. That was essentially her position. She's not a renegade. Well, the fact that for a year previously she had been acting as a solo practitioner, for lack of a better term, was relevant to whether or not he was merely present, whether he just went along for the right or whether he went along as her pimp. That's the only purpose for which we were seeking to admit it. And I would submit that under Clark v. Arizona, it's a denial-of-due process where a defendant is denied the right to present evidence relevant to an element of his defense. And one of the elements of his defense, his entire defense – he didn't deny he went there. He didn't deny he went along. But he denied that he recruited her or he encouraged her or that he was her pimp. But his – his argument was fully ventilated, no, before the jury. I mean, in the closing argument, there was – counsel said that this was not her first rodeo, that she knew where the blade was. She knew all about back page. She knew how to place ads. All that – I mean, the whole defense, it seems to me, pretty much came in. Well, and that was argument. I mean, it's the difference between an attorney and a – Well, it was an argument based on evidence. None of those things were not just created out of the blue. But I was not permitted to bring in the evidence to say to the jury, look, this isn't her first rodeo. She's been doing this for a year. She's been prostituting herself for a year. Unfortunately, that was the reality of the situation. And the jury wasn't proven with – provided with the whole picture. I did the best I could to make this argument without having essential evidence. And again, it may not have been that important if the government hadn't attacked her credibility. And also, they're invoking the rape shield law, which is aptly called a shield. The intent of the rape shield law is to protect the victim. It's set forth in the advisory – the notes to the advisory committee and also in many of the opinions which cite the protections to safeguard the alleged victim against invasion of privacy, potential embarrassment, and sexual stereotyping, et cetera. She did not want to avail herself of that protection. That was a shield for her. And the government took that shield and used it as a sword to preclude her from telling her truth. This young lady wanted this jury to know that she was a solo practitioner. She was not happy with the government. She was not happy with the way they treated her. She felt her testimony was coerced. We made that argument. And then they called her a liar and stopped her from telling her truth, which was – Is there – is there any case that says that the district judge needed to let her waive this protection? Well, I would submit, Judge, there's never been a case where the government has invoked the rape shield against the wishes of a victim. Do we know that? I have not found any case where that's – that's ever been published where that's been – where that's happened. Usually, a defendant will try and bring in prior instances of sexual misconduct – sexual conduct to show that the victim was consenting. Well, consent is not a defense, and consent was not our defense. And I would submit that that shield is her shield, and I would like to analogize it somewhat to a search and seizure. The only individual who has a right to object to a lawful – to an unlawful search and seizure is a person who has a right to privacy. In this particular case, this was Jordan's right to privacy. This was a shield that was there to protect her that she did not want to avail herself of. Not only did she want to tell her truth, but again, the underlying evidence was relevant to his defense, and they chose to – the jury didn't get the full story. They chose to use this shield as a sword to protect her. What about this Elbert case, 8th Circuit case? Doesn't that – isn't that basically the same facts as this case? I don't think there was one case cited where the rape shield has been invoked when a victim did not want to invoke or where the defense was mere presence. The majority of those cases have to do with the – that it was – that she wasn't – the victim wasn't being coerced or that the victim wasn't consenting. Again, there was no allegation here that he coerced her, and we're not arguing that it was consent. We're arguing intent. His intent is what is the – is the crux of this entire case. Your argument is that this – the intent of the – this supposed whether she's a victim or not, whatever you want to call it, that should govern whether the statute applies? Is that your argument, basically, that it's – it doesn't apply depending on if the alleged victim doesn't want it to apply? Well, I think the rape shield – the purpose of the rape shield is to protect the victim, to prevent her – Well, but it's on the books. It says what it says. I mean, are courts supposed to ignore it depending on some – No, I would submit that under the way – the way – the way the rule is written, it's meant to – it talks about, and again, the advisory notes, is to safeguard the alleged victim. It's not for the government to preclude relevant evidence after its victim goes sideways on them. The victim didn't say what the government wanted her to say, so then they used the sword as a shield to preclude not only my client, as indicated from telling – presenting evidence that went to his mens rea, but also to preclude her from telling her truth. The Eighth Circuit says it's irrelevant. They say whether minor victims had engaged in acts of prostitution before or after their encounters with the defendant is irrelevant. Well, it's irrelevant when it goes to an issue of the consent. Well, you know, this victim is engaged – a lot of times it's invoked by defendants. For this victim's in sexual misconduct, she wanted to engage in this conduct, even though I was her pimp, she wanted to do it, therefore I'm not guilty. That's the consent argument. Again, that's not his argument. His argument is I did not have the mens rea. I did not have the intent to traffic this young lady. I went along because I liked her. But mens – well, I didn't understand mens rea to be the main point of contention. I thought his point of contention was whether he was really getting money from her, whether he was really acting as her pimp. Well, and if he was acting, what was his intent in going along there? If he was in that car and he was going along as her pimp, even though he may not have been physically driving, if he was aiding and abetting, if he was harboring, if he was enticing, if he was recruiting her, then he's guilty. And I think that goes to what was his intent in being there. Was his intent to be with a girl he liked or was his intent to prostitute her? And the fact that she had never used a pimp. Would you make the same argument if the government hadn't called King to rebut her? Would you – are you saying that your argument depends on that fact? If the government – Hadn't – you've expressed sort of outrage that the government's calling King to refute her testimony. So is that what your argument depends on, that act of the government? No, I think – and at different stages, I had wanted to bring this evidence in. This was evidence that was – that I received days before trial that they had not given to me. And I had asked to bring it in and the judge had said, no, you can't bring that in. But however, I think that once they chose to attack her credibility, that's diminishing my client's mere presence defense, which was supported by Jordan. So they bring in King to impeach her credibility. King's testimony made – it was an issue of who do you believe? Are you going to believe King or are you going to believe Jordan? And since it is so intricate to his defense, again, what was his – he was there. He went along with them. But did he go along as a guy who liked a girl or did he go along as a pimp? And the fact that she said, I don't use a pimp and they called her a liar, he should have been able to say, well, no, no, look, she's been doing this for a year. And again, it's not the underlying sexual conduct that we were seeking to present. It was just the fact that this young lady has never used a pimp and you're accusing him of being her pimp. I think that's why it becomes relevant and credibility was everything in this case, whether or not you believed King or whether or not you believed Jordan. And I think my time's up. I appreciate it. I'll still give you a minute for rebuttal. Thank you. Good morning. May it please the Court. V. J. Schenker for the United States. Your Honor, touching at this point solely on the Rule 412 issue, my colleague, I think, encapsulated exactly what the issue is here when she herself described what it is that she wanted to get in at trial, and that was she wanted to say she's been doing this for a year. That is precisely the type of evidence that Rule 412 forecloses. That is exactly the policy judgment that the Rules Committee and Congress made, that the evidence should not be brought in. We are talking about a 15-year-old victim here. And so for the defense to come in and say she's been doing this for a year is exactly what Congress thought should not be brought before the jury. But what if she doesn't want the protection? Does that factor in? It does not, Your Honor. This is a rule of evidence, and it starts out as a rule of inadmissibility with certain limited enumerated exceptions. One of those is not the desires of the victim. And there are good reasons for that. And I think those reasons are exemplified in this very case. We have a victim who came out at trial, was contacted by this defendant from jail, and told not to testify, make yourself scarce, don't testify against me, and whose family was also threatened by one of the two defendants. Of course, King was no longer a defendant. He became a witness. But at the time he was a defendant, one of these two defendants contacted her family and threatened them. That is exactly why we don't want to be putting victims in the place of having to choose. Do I invoke this rule? Is it mine to waive? It's not the victim's decision to make. It's the – it's a rule of evidence. If the government seeks to invoke it to preclude testimony, then it's up to the district court. And, of course, we're on an abuse of discretion standard here. So was it in an abuse of discretion for the district court to conclude that this is the very type of evidence covered by the rule? And none of the exceptions applied here. With that, government's happy to rest on its briefs on all of the other issues, but – Well, you didn't try this case. I did not, Your Honor. So I'm not being critical of you. But in reviewing this case, this wasn't the best thing the government has done. There was some – some really difficult things for me to understand why the government was acting the way it did, and primarily at the end where the government says they believe a witness. Even a law student knows that's wrong. And – and all of these individual errors just sort of bother me. And your opposition says that these cumulative errors should give a new trial, that is, maybe one of them lives and get a reversal, but the series of them show there was an unfair trial and that we should go back and let them try it again with a different prosecutor. What's your response to that argument? Well, Your Honor, taking them individually first, and then of course I can address the cumulative error argument, I'd be happy to start with the vouching issue. First of all – I think the vouching issue is the most important. You don't have to do them all. I understand that. Sure. But the vouching one was inexcusable. Yes, Your Honor. And of course, we are here under plain error review on that issue. I just want to start with that. But as we acknowledged in our brief, if you look at the statement in isolation and take out that snippet, we don't dispute here on appeal that that does constitute vouching as the courts have defined it. What is clear from this, as Your Honor said, even a law student knows that, what's clear from this is that the prosecutor immediately knew it herself. And I'm not saying that that unrings the bell, but this Court has said that we don't have prosecutorial misconduct when it's clearly an inadvertent statement or a misstatement. The prosecutor – I understand that. And the instruction was put in that the argument is not evidence, they're not to consider as evidence. So you have a lot of backup on it. Right. But the cumulative error idea is, as I understand it, even though one of the errors wouldn't cause reversal, when you put them all together, there hasn't been a fair trial. And counsel did not argue that, but I'm just curious, the government's position on that, why can we consider that we should not consider the cumulative error idea and give a reversal to the case and try it again? Yes, Your Honor. Well, the standard for cumulative error in this Court's cases is a very high standard. And ultimately the question is, was the defendant deprived of his or her due process right to a fair trial? This Court and others have recognized that trials are difficult proceedings with lots of errors, they affect the outcome of the verdict, have to be addressed. What we have here are admittedly, as we have acknowledged in our brief, a few instances – isolated, brief, and corrected – of misstatements by the prosecutor. We don't back away from that. The question is, was the defendant deprived of his right to a fair trial? Right. With respect to two of the witness statements that came out inadvertently, one was the reference to Caliente Youth Center and the other was the reference to jailhouse calls by Detective Leung. In both of those situations, we had immediate curative instructions by the District Court. The testimony was stricken from the record and the jury was instructed not to consider it. And then subsequently in the closing instructions, the jury was instructed that testimony that had been stricken could not be considered as evidence. And so we do have things that came out inadvertently. They are regrettable. The jury was also instructed something to the effect of, you should be especially suspicious of King's testimony or his credibility. Was that in response to the vouching or was that already planned? No, that was a planned instruction. So we have really, with respect to the vouching, I think we have four instructions that are relevant here. Two of them were sort of together, but one was that statement and arguments by attorneys are not evidence. The second one was that closing arguments specifically are not evidence. The third was that the jurors are the sole judges of credibility of witnesses. And the fourth one was that King's testimony should be viewed with greater caution because he was a cooperating witness. So that was basically a cooperating witness instruction, not so much tailored to the vouching situation. In any event, the broader point is that all of these instructions together, which the jury is presumed to follow, I think mitigate the few errors that happened in this trial. It was not an especially lengthy trial, but it was a four-day trial with numerous witnesses. And I think the Court, including the Supreme Court, has recognized that a defendant is entitled to a fair trial, but not a perfect trial. Could you clarify just a factual thing for me? The text messages, were they shown to the jury or were they only described by Leung? They were shown to the jury. They were in an exhibit. Okay. Thank you. Thank you, Counsel. We'll give you a minute for rebuttal. Thank you, Your Honors. I would point out that under 412, one of the exceptions 412, there are only three exceptions permitting the Court to admit the type of evidence in a criminal case. And paragraph C is when the evidence whose exclusion would violate the defendant's constitutional rights. And I would submit that since this did go to an element of the offense, whether or not his – what his intent was, whether or not he was a pimp, then under C, that the evidence would have been admissible regarding the prosecutor's misconduct. I think it was egregious in this case regarding to Caliente. Not once but twice did the prosecutor elicit this testimony. She was admonished after the first time not to do it. Then she did it again. And obviously, Caliente tied Mr. King to my client, Mr. Haynes, because Jordan also testified extensively, basically, that Caliente is a youth holding facility where you go when you engage in criminal conduct. And in regard to the jail call, again, prior to the testimony, the DA was admonished to make sure that Detective Leung did not bring that up and he did it anyways. This was not just an isolated incident of misconduct. And the nail in the coffin was the vouching and the closing arguments. So based upon, I think, cumulatively, there was cumulative error in this case. Thank you. Thank you. Thank you both sides for the helpful arguments. The case is submitted. And our final case on calendar. Okay. Our final case on calendar is BK v. Betlock. 17-17501 and 17-17502. In this case, each side will have 20 minutes.
judges: Wallace, Friedland, Adelman